IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

No. 18-14096

_____

D.C. Docket No. 4:16-cv-00511-MW-CAS

REIYN KEOHANE,

Plaintiff - Appellee,

versus

FLORIDA DEPARTMENT OF CORRECTIONS SECRETARY,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

Before WILLIAM PRYOR, Chief Judge, WILSON, MARTIN, JORDAN,
ROSENBAUM, JILL PRYOR, NEWSOM, BRANCH, GRANT, LUCK, LAGOA,
and BRASHER, Circuit Judges.

BY THE COURT:

A petition for rehearing having been filed and a member of this Court in

active service having requested a poll on whether this appeal should be reheard by

the Court sitting en banc, and a majority of the judges in active service on this

Court having voted against granting rehearing en banc, it is ORDERED that this

appeal will not be reheard en banc.

WILLIAM PRYOR, Chief Judge, joined by BRANCH, Circuit Judge, statement respecting the denial of rehearing en banc:

I voted with the majority not to rehear this appeal en banc. I write separately to explain why my dissenting colleague is wrong to assert that a grant of en banc review is somehow objectively "demand[ed]" or is "an obligation," Dissenting Op. at 23, 45–46, in this appeal or any other. No statute, precedent, rule, or internal operating procedure imposes such an obligation. The decision to grant en banc review is always discretionary and disfavored.

No source of law *obligates* us to hear *any* appeal en banc. To be sure, a statute grants us the authority to hear appeals en banc. *See* 28 U.S.C. § 46(c). And a rule elucidates some procedural aspects of en banc review. *See* Fed. R. App. P. 35. We have added details of our own. *See* 11th Cir. R. 35-1–35-10; Fed. R. App. P. 35, IOP 1–9. But none of those rules requires us to hear any appeals en banc.

Precedent points in the same direction. The Supreme Court long ago explained that the statute permitting en banc review "vests in the court[s of appeals] the power to order hearings *en banc*." *W. Pac. R.R. Case*, 345 U.S. 247, 250 (1953). But "[i]t goes no further. It neither forbids nor requires each active member of a Court of Appeals to entertain each petition for a hearing or rehearing *en banc*." *Id.* Ten years later, the Supreme Court reaffirmed this view: "the rights of the litigant go no further than the right to know the administrative machinery

3

that will be followed and the right to suggest that the *en banc* procedure be set in motion in his case." *Shenker v. Balt. & Ohio R.R. Co.*, 374 U.S. 1, 5 (1963). And more recently, the Supreme Court acknowledged yet again that "[r]ehearing [e]n banc is a *discretionary* procedure employed only to address questions of exceptional importance or to maintain uniformity among Circuit decisions." *Missouri v. Jenkins*, 495 U.S. 33, 46 n.14 (1990) (emphasis added); *see also* Bryan A. Garner et al., *The Law of Judicial Precedent* § 61, at 496 (2016) ("The decision to grant a petition for hearing or rehearing en banc, or to initiate en banc review on the court's own motion, is discretionary."); 16AA Charles A. Wright et al., *Federal Practice and Procedure* § 3981.1, at 496 (5th ed. 2020) ("Consideration en banc rests in the discretion of the court of appeals."). The Supreme Court has described this process as "essentially a policy decision of judicial administration." *Moody v. Albemarle Paper Co.*, 417 U.S. 622, 627 (1974).

The grant of en banc review is and should be rare. The Federal Rules of Appellate Procedure say so: "An en banc hearing or rehearing is not favored . . . ." Fed. R. App. P. 35(a). Practical considerations confirm why: "[T]he institutional cost of rehearing cases *en banc* is extraordinary. . . . It is an enormous distraction to break into [our regular] schedule and tie up the *entire* court to hear one case *en banc*." *Bartlett ex rel. Neuman v. Bowen*, 824 F.2d 1240, 1243 (D.C. Cir. 1987) (Edwards, J., concurring in denial of rehearing en banc). After all, a panel of three

4

judges has already spent considerable resources deciding the appeal once. For that reason, we and our sister circuits have said again and again that the "heavy artillery" of en banc review should be used rarely. *United States v. Hogan*, 986 F.2d 1364, 1369 (11th Cir. 1993); *see, e.g.*, *Mitts v. Bagley*, 626 F.3d 366, 369–71 (6th Cir. 2010) (Sutton, J., concurring in denial of rehearing en banc); *Kane County v. United States*, 950 F.3d 1323, 1324 (10th Cir. 2020) (Phillips, J., concurring in denial of rehearing en banc); *Church of Scientology of Cal. v. Foley*, 640 F.2d 1335, 1339–42 (D.C. Cir. 1981) (en banc) (Robinson, J., dissenting).

Because en banc review is both discretionary and disfavored, reasonable minds can differ about whether it is appropriate in a particular case. Indeed, the problem of deciding whether to grant en banc review is evergreen; a judge wrestling with the decision decades ago remarked that sometimes "one judge's case of 'exceptional importance' is another judge's 'routine or run-of-the-mill' case." *Bartlett*, 824 F.2d at 1242 (Edwards, J., concurring in denial of rehearing en banc). Judges can reasonably disagree about the best way to allocate our judicial resources. And, of course, I never take any colleague's disagreement personally. *Cf.* Dissenting Op. at 24 n.1. For the same reason, disagreements about whether to grant rehearing do not warrant attacks on the integrity of judges or their commitment to the rule of law nor, good grief, on the legitimacy of this Court. *See id.* at 23–24 & n.1, 28–29, 41–42, 45.

5

NEWSOM, Circuit Judge, joined by LUCK, Circuit Judge, concurring in the denial of rehearing en banc:

I offer the following pre-buttal to Judge Rosenbaum's dissent from the denial of rehearing en banc.

Before jumping into the merits, let me say this by way of introduction: More often than not, any writing's persuasive value is inversely proportional to its use of hyperbole and invective. And so it is with today's dissental—which, rather than characterizing, I'll let speak for itself.[1] Among other things, the dissental accuses me—as the author of the panel opinion—of "inaccurately purport[ing]" (and alternatively "claiming") "to apply the governing prior precedent" in *Thomas v. Bryant*, 614 F.3d 1288 (11th Cir. 2010), "reimagin[ing]" *Thomas*'s holding, construing *Thomas* "as [I] pleased," "pretending" that *Thomas* sanctioned a standard of appellate review that it "demonstrably did not," "distort[ing] beyond recognition" this Court's prior-panel-precedent rule and "remold[ing]" it into an "unrecognizable and dangerous form," and now, in this opinion, of engaging in "distraction tactics." Rosenbaum Dissenting Op. at 23, 24, 26, 28, 30, 32, 42, 43, 44.

---

[1] For the most part, I'll use the term "dissental" to refer to Judge Rosenbaum's dissent from the denial of rehearing en banc, thereby distinguishing it from Judge Wilson's panel-stage dissent. *See* Alex Kozinski & James Burnham, *I Say Dissental, You Say Concurral*, 121 Yale L.J. Online 601 (2012).

And there's so much more where that came from.  The dissental saves its most biting criticism—and its most soaring rhetoric—for the seven judges who voted against rehearing.  All of us, the dissental not so subtly implies, cast our votes simply because we "agree[d] . . . with the ultimate outcome" of the panel opinion.  *Id.* at 24.  In declining to rehear the case, the dissental charges, we have blessed a "rogue interpretation of the prior-precedent rule," sanctioned a "critical threat to the stability and predictability of the law," and thereby unleashed "potentially devastating consequences."  *Id.* at 23, 45.

Strong words.  Not a one of them true.  Allow me to turn down the volume and provide a little perspective.

## I

I begin with a brief factual summary.

Reiyn Keohane is a Florida inmate currently serving a 15-year sentence for attempted murder.  Keohane was born anatomically male, but she began to identify as female sometime during her preadolescent years.  Beginning at age 14—and up until the time she was incarcerated at 19—Keohane wore women's clothing, makeup, and hairstyles.  At 16, she was formally diagnosed with gender dysphoria.  About six weeks before the arrest that eventually landed her in prison, Keohane began hormone therapy under the care of a pediatric endocrinologist.  *See Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1262 (11th Cir. 2020).

7

Upon her incarceration in a Florida prison, Keohane requested (as relevant here) two forms of treatment. First, she sought to continue hormone therapy. That request was initially denied for reasons that have no real bearing on my colleague's dissental and that I therefore won't belabor. *See id*. at 1262–63. In short, though, not long after Keohane filed suit, the Florida Department of Corrections reversed course and referred Keohane to an outside endocrinologist, who immediately prescribed her hormone therapy. *See id*. at 1263. The panel majority held that the FDC's decision to grant Keohane's hormone-therapy request mooted her challenge to the initial denial of that treatment. *See id*. at 1270–72. The dissental doesn't take issue with the panel's mootness determination, so for present purposes we can leave the hormone-therapy requests to the side. *See* Rosenbaum Dissenting Op. at 30 n.3.

Second, and separately, Keohane requested the ability to engage in "social transitioning"—in particular, she asked to wear female undergarments and makeup, and to grow out her hair in a long, feminine style. *Keohane*, 952 F.3d at 1263. The FDC refused Keohane's social-transitioning requests on the grounds that they violated prison policy—which required male inmates to wear "[u]nder shorts" and to "have their hair cut short to medium uniform length at all times with no part of the ear or collar covered," Fla. Admin. Code r. 33-602.101(2), (4)—and that they posed a security risk. *Keohane*, 952 F.3d at 1263. Most notably, the

8

FDC expressed concern that an inmate wearing makeup and female undergarments would inevitably become a target in an all-male prison, thereby endangering not only the inmate but also the prison employees who would have to step in to protect her. *Id.* The FDC also (and relatedly) determined that there were clear advantages to maintaining uniformity in a prison setting, including the ability to more readily detect contraband. *Id.*

As relevant to the concerns raised in the dissental, the district court held that by refusing Keohane's social-transitioning requests, Florida prison authorities were "deliberately indifferent" to Keohane's serious medical needs in violation of the Eighth Amendment. *Id.* at 1264–65. Accordingly, the court entered an injunction ordering prison officials to "permit Ms. Keohane to socially transition by allowing her access to female clothing and grooming standards." *Id.* at 1265. On appeal, the panel held (again, as relevant here) that the FDC did not violate the Eighth Amendment by refusing to accommodate Keohane's social-transitioning-related requests, and we therefore vacated the district court's injunction. *See id*. at 1272–80. In so doing, we reviewed de novo the district court's ultimate determination that there was an Eighth Amendment violation, and we reviewed subsidiary issues of fact for clear error. *See id*. at 1272 & n.8 (citing *Thomas v. Bryant*, 614 F.3d 1288 (11th Cir. 2010)).

9

## II

Next, a bit of necessary legal background:  A deliberate-indifference claim entails two components, the latter of which entails three sub-components.  *See Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1270 (11th Cir. 2020).  First, the inmate must establish "an objectively serious medical need"—that is, "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention"—that, "if left unattended, poses a substantial risk of serious harm."  *Id.* (quotation marks omitted).  Second, the inmate must prove that prison officials acted with deliberate indifference to that need by showing (1) that they had "subjective knowledge of a risk of serious harm" and (2) that they "disregarded" that risk (3) by conduct that was "more than gross negligence."  *Id.*

Here, there's no debate about the first component—everyone agrees that Keohane's gender dysphoria constitutes a serious medical need.  Rather, the parties' dispute (and the dissental's concern) hinges on the application of—and in particular our review of—the second component.

## III

Today's dissental is predicated on an assertion that the panel only "purport[ed] to follow," but instead strategically "reimagine[d]," this Court's earlier decision in *Thomas v. Bryant*, 614 F.3d 1288 (11th Cir. 2010), when we

held that the de novo—rather than the clear-error—standard of review applied to the district court's determination that prison officials violated the Eighth Amendment in refusing Keohane's social-transitioning requests. *See* Rosenbaum Dissenting Op. at 26, 29, 43. And because the panel turned its back on *Thomas*, the dissental asserts, it violated this Court's prior-panel-precedent rule, pursuant to which "a prior panel's holding is binding on all subsequent panels unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by this court sitting *en banc*." *United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008).

With respect, the panel didn't "reimagine" *Thomas*—let alone reimagine it "as [we] pleased." Rosenbaum Dissenting Op. at 26, 32. To the contrary, and the dissental's shade-throwing notwithstanding, the panel *followed Thomas*—or, to be more precise, it followed the breadcrumbs left in *Thomas*'s various (and sometimes conflicting) passages. Because the panel followed (rather than "flout[ed]," *see id*. at 23) *Thomas*, it didn't violate the prior-panel-precedent rule. And because the panel didn't violate the prior-panel-precedent rule, the basis for the dissental evaporates.

In an effort to paint a picture of lawless, result-oriented judging, the dissental gives the misleading impression that *Thomas* is pellucidly clear—that it just says, over and over and over, that the entirety of an Eighth Amendment claim,

11

from stem to stern, is subject only to clear-error review, and that the panel, in the face of all that clarity, willfully bulled ahead with de novo review instead. As is so often the case, the reality is more complicated.

It is true, as the dissental says, that *Thomas* states that "[a] prison official's deliberate indifference is a question of fact which we review for clear error." 614 F.3d at 1312; *see also id.* at 1302 ("Subsidiary issues of fact are reviewed for clear error."). In our opinion, the panel candidly admitted as much. *See Keohane*, 952 F.3d at 1272 n.8. But *Thomas* also holds—and I'll just quote it directly—that an appellate court must review the ultimate determination "that there was an Eighth Amendment violation warranting equitable relief . . . *de novo*." *Thomas*, 614 F.3d at 1303.

For better or worse, then, it fell to the panel to try to synthesize those competing directives. And for what it's worth—and totally unsurprisingly, I'm sure—I think the panel got it exactly right. Let me explain.

A

Despite all the adverbs that the dissental uses to describe the *Thomas* opinion—it says, in turn, that *Thomas* "expressly," "demonstrably," "unmistakably," "unambiguously," and "repeatedly" prescribed across-the-board clear-error review—everyone recognizes that some synthesis of *Thomas*'s mixed messages is necessary. I recognize it. Judge Wilson's panel dissent recognized it.

12

And, yes, even Judge Rosenbaum's dissental ultimately recognizes it.  Here, it seems to me, are the contenders:

**1.  *The Panel Opinion*.**  In tackling the case, the panel took seriously *Thomas*'s dual directives (1) that an appellate court must review de novo the district court's ultimate determination "that there was an Eighth Amendment violation warranting equitable relief" and (2) that "[s]ubsidiary issues of fact are reviewed for clear error."  614 F.3d at 1302.  Accordingly, we held (1) that the clear-error standard governs what we (echoing the Supreme Court) called "historical facts—*e.g.*, what happened, who knew what, how did they respond?"— but (2) that "what the Eighth Amendment means—and requires in a given case—is an issue squarely within the core competency of appellate courts" and is thus subject to de novo review.  *Keohane*, 952 F.3d at 1272–73 n.8.  The panel opinion therefore gives meaningful roles to both the de novo and clear-error standards, both of which *Thomas* prescribes.

**2.  *The Dissental's Proposal*.**  Today's dissental suggests (without quite saying) that, perhaps, de novo review applies *only* to the first, objective component of a deliberate-indifference claim:  "*Thomas*'s precise statements applying clear-error review to all components of the subjective inquiry . . . are entirely harmonious with *Thomas*'s statement that de novo review applies to the overarching question of deliberate-indifference.  The overarching standard of

13

review is necessarily de novo *because it incorporates within it de novo review of the objective inquiry of the deliberate-indifference analysis*." Rosenbaum Dissenting Op. at 33 (emphasis added); *see also id.* at 34 n.5 ("[De novo review] extends to the ultimate conclusion because the ultimate conclusion necessarily *includes within it a determination based on de novo review (the objective inquiry)*." (emphasis added)).

With respect, that can't be correct. The *Thomas* opinion prescribes de novo review in *two* separate places—with respect to *two* different issues. In one place, it states that the constituent determination whether the deprivations suffered by the inmate "are objectively 'sufficiently serious' to satisfy the objective prong" of the deliberate-indifference standard "is a question of law" subject to de novo review. *Thomas*, 614 F.3d at 1307. In another, it states, separately, that the district court's ultimate determination "that there was an Eighth Amendment violation warranting equitable relief"—*i.e.*, the *entirety* of that determination—"is reviewed *de novo*." *Id.* at 1302. So de novo review unquestionably applies to more than just the first prong of the deliberate-indifference standard—it applies, somehow or another, to the whole enchilada.

**3. *The Panel Dissent*.** Which brings me to the panel dissent's reading of *Thomas*. It seemed to appreciate that de novo review applies to the entirety of the deliberate-indifference claim—to the ultimate determination that the Eighth

14

Amendment was violated—but it left the de novo standard only a vanishingly

small role:

> [I]f the district court, despite checkmarks in both the objective and
> subjective boxes, still concluded that there was no Eighth Amendment
> violation, we would lend no deference to this error. We would review
> it de novo, and would no doubt reverse. And if the district court,
> despite holding that one of the elements was not met, still concluded
> that there was an Eighth Amendment violation, we would do the
> same. We would review this error de novo, and no doubt
> reverse. *That* is the ultimate conclusion that we review de novo.

*Keohane*, 952 F.3d at 1288 (Wilson, J., dissenting).

With respect, that can't be right, either. As the panel majority explained in

our opinion, it is inconceivable that "the de novo standard's sole office is to ensure

that the district court puts 'checkmarks' in the right boxes, and then doesn't make a

truly boneheaded, asinine mistake." *Id*. at 1273 n.8.[2]

**B**

Among the available alternatives, it won't surprise you to learn that I think

the panel's synthesis of *Thomas*'s mixed messages is clearly correct. I say so for

---

[2] The dissental suggests that the panel "g[ave] itself permission to reimagine what *Thomas* held because it conclude[d] that what *Thomas* expressly said 'cannot possibly be what we've meant.'" Rosenbaum Dissenting Op. at 26 (quoting *Keohane*, 952 F.3d at 1273 n.8). No. What the panel said in the passage that the dissental snatch-quotes is that *the panel dissent's "checkmark" interpretation* of de novo review "cannot possibly be what we've meant when we have repeatedly held that de novo review applies to the district court's determination whether 'there was an Eighth Amendment violation warranting equitable relief.'" *Keohane*, 952 F.3d at 1273 n.8 (quoting *Thomas*, 614 F.3d at 1303).

15

reasons that I have already explained and that neither of my dissenting colleagues has even engaged, let alone rebutted.

### 1

First, the panel's interpretation gives meaningful roles to both the de novo and clear-error standards—both of which, again, *Thomas* expressly prescribes. By contrast, neither of my dissenting colleagues has any viable explanation of what role de novo review should play in Eighth Amendment deliberate-indifference cases. As between the courts of appeals and the district courts, who decides what the Eighth Amendment ultimately means and requires in a given case? On their theories, the district courts do—at which point the appellate courts' hands are pretty much tied. What an odd state of affairs. In what other circumstance do the courts of appeals effectively cede to district courts the job of determining the meaning and proper application of the Constitution?[3]

### 2

Second, "meaningful appellate review of a district court's ultimate constitutional holding follows straightaway from Supreme Court precedent

---

[3] I note that while a holding that clear-error review applies to the entirety of the deliberate-indifference analysis—and effectively binds us to the district courts' determinations—might serve Keohane well in this particular case, it would be cold comfort to the multitude of prisoners who appeal from district court orders *rejecting* deliberate-indifference claims. And of course, the *vast* majority of deliberate-indifference cases that appellate courts see arise on appeal by inmates who have lost below.

16

prescribing de novo review of other application-of-law-to-fact questions—including those arising under the Eighth Amendment." *Keohane*, 952 F.3d at 1273 n.8. In *United States v. Bajakajian*, 524 U.S. 321 (1998), for instance, the Supreme Court rejected the contention that an appellate court should defer to a district court's determination whether a fine is excessive for Eighth Amendment purposes. As the Supreme Court explained there, while the district court's factual findings in conducting the excessiveness inquiry "must be accepted unless clearly erroneous," "whether a fine is constitutionally excessive calls for the application of a constitutional standard to the facts of a particular case"—and thus calls for "*de novo* review." *Id*. at 336–37 & n.10.

Similarly, in *Ornelas v. United States*, the Supreme Court held "that as a general matter determinations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal." 517 U.S. 690, 699 (1996). The Court acknowledged—precisely as our opinion did—"that a reviewing court should take care both to review findings of *historical fact* only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." *Id*. (emphasis added); *see Keohane*, 952 F.3d at 1273 n.8. But it insisted that the ultimate determination—the application of the constitutional standard to those facts—demands de novo review. Significantly, the Court gave three reasons to support its holding, all of which apply equally here: (1) the

17

constitutional standards at issue involve "fluid concepts that take their substantive content from the particular contexts in which the standards are being assessed"; (2) the applicable "legal rules . . . acquire content only through application," and "[i]ndependent review is therefore necessary if appellate courts are to maintain control of, and to clarify, the legal principles"; and (3) "*de novo* review tends to unify precedent" and "stabilize the law." *Ornelas*, 517 U.S. at 696–98.

Finally, applying *Bajakajian* and *Ornelas*—and repeating the same considerations—the Supreme Court held in *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, "that courts of appeals should apply a *de novo* standard of review when passing on district courts' determinations of the constitutionality of punitive damages awards" under the Fourteenth Amendment. 532 U.S. 424, 436 (2001).

Except to say that they aren't deliberate-indifference cases, neither of my dissenting colleagues has offered any explanation why the rationale of *Bajakajian*, *Ornelas*, and *Cooper Industries* doesn't apply here. District courts are undoubtedly better situated than appellate courts to make findings of what the panel (echoing the Supreme Court in *Ornelas*) called "historical facts," and their determinations with respect to those facts are accordingly entitled to deference. But what the Eighth Amendment means—and requires in a given case—is, as I have said, an issue squarely within the core competency of appellate courts. And to be clear, it's no answer to say, as the panel dissent did—citing Justice Scalia's

18

solo *dissent* in *Ornelas*—that some issues underlying a deliberate-indifference claim may be "fact-specific and not easy to generalize." *Keohane*, 952 F.3d at 1291 n.13 (Wilson, J., dissenting). The Supreme Court recognized as much regarding the "mixed questions" in *Bajakajian*, *Ornelas*, and *Cooper Industries*— and yet applied de novo review anyway. Just so here.

**3**

Finally, the panel's synthesis of *Thomas*'s standard-of-review conundrum squares precisely with the First Circuit's en banc decision in the factually similar *Kosilek v. Spencer*, 774 F.3d 63 (1st Cir. 2014). The court there rejected the very arguments that my dissenting colleagues have made and held that de novo, rather than clear-error, review governed a district court's determination that the Eighth Amendment required prison authorities to accommodate a transgender inmate's medical-treatment requests. In *Kosilek*, an inmate alleged that the Massachusetts Department of Correction's refusal to provide sex-reassignment surgery to treat the inmate's gender-identity disorder constituted deliberate indifference. *Id.* at 68–69.

Sitting en banc, the First Circuit explained that "[t]he test for establishing an Eighth Amendment claim of inadequate medical care encompasses a multitude of questions that present elements both factual and legal"—and, therefore, that "[r]eview of such 'mixed questions' is of a variable exactitude," such that "the more law-based a question, the less deferentially we assess the district court's

conclusion." *Id.* at 84. Citing our opinion in *Thomas*, the *Kosilek* court held that "[t]he ultimate legal conclusion of whether prison administrators have violated the Eighth Amendment is reviewed *de novo*." *Id.* In so holding, the court rejected the dissenting judges' argument that "the ultimate constitutional question is inextricably tied up with the factual details that emerged at trial," which, according to them, "counsels against pure de novo review." *Id.* at 99 (Thompson, J., dissenting). While acknowledging—again, just as the panel did here—that appellate courts "award[] deference to the district court's resolution of questions of pure fact and issues of credibility," the *Kosilek* majority stood by its conclusion that the ultimate Eighth Amendment question is reviewed de novo. *Id.* at 84–85. Notably, the court buttressed its holding with citations to decisions from several other circuits reaching the same conclusion. *See, e.g.*, *Hallett v. Morgan,* 296 F.3d 732, 744 (9th Cir. 2002) ("The district court's factual findings regarding conditions at the Prison are reviewed for clear error. However, its conclusion that the facts do not demonstrate an Eighth Amendment violation is a question of law that we review de novo."); *Hickey v. Reeder,* 12 F.3d 754, 756 (8th Cir. 1993) ("Whether conduct, if done with the required culpability, is sufficiently harmful to establish an Eighth Amendment violation is an objective or legal determination which we decide de novo."); *Alberti v. Klevenhagen,* 790 F.2d 1220, 1225 (5th Cir. 1986) ("[O]nce the facts are established, the issue of whether these facts constitute a

20

violation of constitutional rights is a question of law that may be assayed anew upon appeal.").

\* \* \*

So in short, the panel here didn't "reimagine" this Court's earlier decision in *Thomas* but, rather, synthesized *Thomas*'s mixed messages in accordance with Supreme Court and other circuits' precedents.

## IV

I'll conclude where I began. For all its rhetorical flourish, today's dissent from denial simply doesn't make a compelling argument that this case warranted en banc reconsideration. The panel was faced with the vexing question of how the de novo and clear-error standards of review map onto the various elements and sub-elements of an Eighth Amendment deliberate-indifference claim—a question made all the more vexing by *Thomas*'s (let's just say) imprecise discussion of that issue. Faced with all that ambiguity, the panel did its level best—both to apply *Thomas* and to faithfully and correctly decide the case before it. I, for one, think the panel got it exactly right. But even if I'm wrong about that—and reasonable minds can disagree—the worst that can be said of the panel opinion is that it "misappli[ed the] correct precedent to the facts of the case." 11th Cir. R. 35-3. In this Circuit, that is not a ground for en banc rehearing. *Id.*

21

While the dissental's spicy rhetoric doesn't enhance its argument—but rather pretty severely diminishes it, to my mind—it does, I fear, corrode the collegiality that has historically characterized this great Court.  Here's hoping for better—and more charitable—days ahead.

ROSENBAUM, Circuit Judge, joined by WILSON, MARTIN, and JILL PRYOR, Circuit Judges, dissenting from the denial of rehearing en banc:

This is not an easy dissent to write—not because the legal issue involved in the merits of this case is complex or difficult (it's not), but because our denial of rehearing en banc here is not—or at least should not be—normal. We are denying en banc rehearing in a case that objectively qualifies for it under the Federal Rules of Appellate Procedure and that indeed demands it to preserve the sanctity of the prior-precedent rule and the important policies of stability and predictability that that rule serves.

Our failure to hold en banc review in a case where the panel opinion contradicts our holdings in opinions earlier panels issued yet claims nonetheless to comply with the prior-precedent rule introduces uncertainty and confusion into the law of our Circuit. And worse, it undermines the prior-precedent rule, "the foundation of our federal judicial system." *Smith v. GTE Corp.*, 236 F.3d 1292 (11th Cir. 2001) (quoting *Jaffree v. Wallace*, 705 F.2d 1526, 1533 (11th Cir. 1983)). We as a Court must reckon with these potentially devastating consequences of our actions if we continue to allow opinions that flout the prior-precedent rule while claiming they comply with it to issue unchecked.

A case like this one, where the opinion distorts beyond recognition the prior-precedent rule—a fundamental mechanism by which this Court ensures the

23

predictability and stability of the law—is exactly the kind of case for which the en banc tool was designed.  For that reason, whether any individual judge agrees or disagrees with the ultimate outcome of *Keohane* should be irrelevant to the question of whether this case warrants en banc review.  Too much is at stake.

I am sure each of us believes that we are applying the appropriate standards in determining whether to vote for en banc rehearing.[1]  But an objective analysis suggests we are not.  So we need to recalibrate.  I urge our Court—and each of us individually—to carefully and objectively reexamine this vote and to truly reflect on the dangers of condoning panel opinions that contradict our prior precedent while nonetheless claiming to follow the prior-precedent rule.

I divide my discussion into three substantive sections.  In Section I, I review the law governing the limited circumstances in which en banc review is appropriate.  In Section II, I show that this case warrants en banc rehearing.  And in Section III, I

---

[1] I am truly sorry that Chief Judge Pryor and Judge Newsom seem to have taken my concerns personally.  I do not believe this dissent to be personal.  I have great respect for all my colleagues, and I value this Court's collegiality.  But I also have great respect for the rule of law and the need for our Court to maintain its legitimacy.  And I don't agree that defending these things or pointing out what I think is wrong with *Keohane* and explaining why I view it as such a big problem makes me "[un]collegial[]" and "[un]charitable," *see* Newsom Op. at 22, or is an "attack[ on] . . . the integrity of judges or their commitment to the rule of law . . . [or] the legitimacy of this Court," W. Pryor Op. at 5.  Nor do the labels and characterizations the W. Pryor and Newsom Opinions feel a need to impose provide a good enough reason to remain silent in the face of the threat *Keohane* represents to our judicial norms.  I am aware of no other way to oppose what I see as the failure of our Court to require the *Keohane* panel to comply with the prior-precedent rule, other than by writing a dissent that candidly discusses that problem and its significance.

24

explain why we must insist on strict adherence to the prior-precedent rule by every panel.

But first, a word of caution: this dissent is not about what the substantive law that governs Keohane's case should or should not be. And to avoid any possible misunderstanding on that, I begin by stating expressly that I take no position on that in this dissent. Even assuming without deciding that *Keohane* arrived at the objectively legally correct rule for the appropriate standard of review in Eighth Amendment deliberate-indifference claims, the problem here is that on the way to doing so, it issued a new rule that is contrary to our binding precedent while nonetheless attributing that new rule to that same precedent. The proper procedure for overruling binding precedent in this Circuit requires the Court sitting en banc to set it aside; a panel is not free to overrule binding precedent on its own. To be clear, then, this dissent is solely about the importance to the stability and predictability of the law of ensuring every panel strictly follows our prior-precedent rule.

**I.**

Rule 35, Fed. R. App. P., anticipates that en banc rehearing will be ordered only when it is "necessary to secure or maintain uniformity of the court's decisions" or the case "involves a question of exceptional importance." Fed. R. App. P. 35(a).

This is one of those cases.[2]  First, this case objectively warrants en banc review under Rule 35(a) because the panel majority opinion here, *Keohane v. Florida Department of Corrections*, 952 F.3d 1257 (11th Cir. 2020), creates confusion and inconsistency in our Eighth Amendment Circuit jurisprudence.  But second and more urgent is what the *Keohane* panel's interpretation and application of the prior-precedent rule and our refusal to take this case en banc do to that rule.  In trying unsuccessfully to avoid running afoul of our prior-precedent rule and raising a conflict with our earlier precedent known as *Thomas v. Bryant*, 614 F.3d 1288, 1312 (11th Cir. 2010), the *Keohane* majority opinion remolds the prior-precedent rule into an unrecognizable and dangerous form:  it gives itself permission to reimagine what *Thomas* held because it concludes that what *Thomas* expressly said "cannot possibly be what we've meant," *Keohane*, 952 F.3d at 1272.

Our "firmly established" prior-precedent rule strictly requires later panels to follow the precedent of earlier panels unless and until the prior precedent is overruled or undermined to the point of abrogation by the Supreme Court or this Court sitting

---

[2] Chief Judge Pryor notes that "[t]he grant of en banc review is and should be rare."  W. Pryor Op. at 4.  Of course, as I recognize above, that's true, when we consider the total number of cases we review every year.  But that's also an oversimplification of what happened here.  By my count, in the most recent nearly two-year period (since January 1, 2019), we have voted for en banc rehearing in twelve cases.  During that same period, we have voted against en banc review only seven times when a member in active service on this Court has requested an en banc poll.  So once a member of this Court in active service has sought an en banc poll, we have granted en banc rehearing at a rate of 63%—a majority of the time.  Presumably, that is because we exercise extreme discretion in requesting an en banc poll in the first place.

en banc. *United States v. Steele*, 147 F.3d 1316, 1318 (11th Cir. 1998) (en banc); *see also Smith*, 236 F.3d at 1303 n.11. We have described ourselves as "emphatic" in our strict adherence to this rule, *see Steele*, 147 F.3d at 1318 (quoting *Cargill v. Turpin*, 120 F.3d 1366, 1386 (11th Cir. 1997)), and have said that this Court "take[s] [the prior-precedent] rule seriously," *Atl. Sounding Co.*, *Inc. v. Townsend*, 496 F.3d 1282, 1286 (11th Cir. 2007) (Ed Carnes, J., concurring).

We have gone so far as to hold that under that rule, a later panel cannot overrule a prior one's holding "even though convinced it is wrong." *Steele*, 147 F.3d at 1317-18. Indeed, we have held that the prior-precedent rule binds later panels even when the prior panel's decision failed to mention controlling Supreme Court precedent and reached a holding in conflict with that precedent. *Smith*, 236 F.3d at 1302-03. So strong is the prior-precedent rule that under it, a later panel is bound by the earlier panel's "reasoning and result," even when the prior panel does not explicitly state its rule. *See id.* at 1304.

No exceptions to the prior-precedent rule exist. *See id.* at 1302. That is so, we have explained, because if an exception applied, "it could end up nullifying the well-established prior panel precedent rule that is an *essential* part of the governing law of this Circuit." *Id.* (emphasis added). Not only that but the prior-precedent rule "helps keep the precedential peace among the judges of this Court, and it allows us to move on once an issue has been decided." *Townsend*, 496 F.3d at 1286 (Ed

27

Carnes, J., concurring). Without it, as Judge Ed Carnes has cautioned, "every sitting of this court would be a series of do-overs, the judicial equivalent of the movie 'Groundhog Day.'" *Id.*

The Newsom Opinion takes issue with my discussion, describing it as full of "hyperbole and invective" because of my concerns that continued disregard of our prior-precedent rule jeopardizes the rule of law. *See* Newsom Op. at 6. But those concerns are not overblown. Indeed, our own Court has emphasized that the prior-precedent rule "serves as the foundation of our federal judicial system[, as] [a]dherence to it results in stability and predictability." *Smith*, 236 F.3d at 1303 (quoting *Jaffree v. Wallace*, 705 F.2d 1526, 1533 (11th Cir. 1983)). For these reasons, if we continue to allow panels to skirt the prior-precedent rule, we certainly ask for trouble.

Under our prior-precedent rule, if a panel vehemently disagrees with a prior precedent, its only option is to apply it, anyway, and call for en banc rehearing. It may not, under any circumstances, create its own conflicting rule and inaccurately purport to apply the governing prior precedent. And if it does, en banc review is in order—either to correct the panel opinion and make it comply with binding precedent, or to overrule the prior precedent. But in any case, changing prior precedent is not something that a panel may do.

## II.

28

Yet that's precisely what the *Keohane* panel did:  while insisting it was following *Thomas*, it instead created a new rule diametrically opposed to *Thomas*'s holding.  To show that this is necessarily the case, I must first briefly review the relevant facts of Keohane's case (Section A) and the law governing claims of deliberate indifference to prisoners' medical claims (Section B).  Then in Section C I point out how the *Keohane* panel opinion is at war with *Thomas*, the precedent it purports to follow.

## A.

Reiyn Keohane was assigned male at birth, but she has identified as female since she was about eight years old.  ECF No. 171 at 1.  She was formally diagnosed with gender dysphoria when she was sixteen.  *Id.* at 2.  At that time, Keohane began a hormone-therapy regimen.  *Id.*

After her arrest, she was cut off from her treatment, including hormone therapy and the ability to dress and groom as a woman.  *Id*. at 2.  She complained, but the prison did not respond.  *Id.*  Keohane's untreated dysphoria caused her such extreme anxiety that she attempted to kill herself and castrate herself while in custody.  *Id.*

These facts and others led Keohane to sue the Florida Department of Corrections (the "FDC") under 42 U.S.C. § 1983, alleging violations of her Eighth Amendment rights and seeking declaratory and injunctive relief.  As the panel

opinion explained, after a bench trial, the district court entered a 61-page order awarding Keohane relief. As relevant to the concerns I raise in this dissent,[3] the district court directed the FDC to permit Keohane "to socially transition by allowing her access to female clothing and grooming standards." 952 F.3d at 1262 (quoting district court order).

The panel opinion reversed. Claiming to follow *Thomas*, the *Keohane* panel applied the de novo standard of review to certain components of the district court's findings for which the *Thomas* Court had instructed a clear-error standard governs. In so doing, the panel simultaneously injected conflict into our Eighth Amendment deliberate-indifference jurisprudence and stretched interpretation of our prior-precedent rule beyond recognition.

### B.

The Eighth Amendment prohibits the government from inflicting "cruel and unusual punishments" on inmates. *Wilson v. Seiter*, 501 U.S. 294, 296–97 (1991). That prohibition encompasses "deprivations . . . not specifically part of [a] sentence but . . . suffered during imprisonment." *Id.* at 297. An inmate who suffers "deliberate indifference" to her "serious medical needs" may state a claim for a violation of the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976);

---

[3] Appellant's motion for rehearing also seeks rehearing on whether the Majority Opinion correctly applied our mootness exception for voluntary cessation. For purposes of this dissent from the denial of rehearing en banc, I express no views about the propriety of that holding.

*Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004). Under our precedent, a deliberate-indifference claim has two components: an objectively serious medical need and subjective deliberate indifference by the official to that need. *Brown*, 387 F.3d at 1351.

*Thomas* holds that the objective inquiry (whether a serious medical need exists) includes both questions of fact subject to clear-error review and a question of law subject to de novo review. *Thomas*, 614 F.3d at 1307, 1308. I am not concerned with that aspect of *Keohane* because the panel opinion had no occasion to comment on or apply the *Thomas* standard of review to the objective inquiry, since "all agree[d] that Keohane's gender dysphoria" satisfies that requirement. 952 F.3d at 1273. Instead, I focus on the subjective component of Keohane's deliberate-indifference claim.

Before *Keohane*, we had described the subjective inquiry (whether the defendant was subjectively deliberately indifferent to the plaintiff's serious medical need) to require the plaintiff "to prove three ___*facts*___: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence" (the "subjective-inquiry components"). *Brown*, 387 F.3d at 1351 (emphasis added). Of course, in characterizing as "facts" the three things that the plaintiff must prove to satisfy the subjective inquiry, we suggested that the district court's resolutions of the three subjective-inquiry components were findings of fact.

31

Then, as Judge Wilson plainly showed in his dissent in *Keohane*, 952 F.3d at 1289-92 (Wilson, J., dissenting), we said precisely that a few years later in *Thomas*. There, several inmates sued FDC employees, alleging that their use of chemical agents on certain mentally ill inmates violated the Eighth Amendment. 614 F.3d at 1293. After a five-day bench trial, the district court determined that the FDC's non-spontaneous disciplinary use of chemical agents on inmates who, at the time, were unable to conform their behavior to prison standards because of their mental illnesses, violated the Eighth Amendment. *Id.* at 1294. The FDC employees appealed this conclusion (among other district-court actions not relevant here). *Id.*

In analyzing the appeal, we noted that we review de novo the "legal conclusion—that there was an Eighth Amendment violation[,]"—but that "[s]ubsidiary issues of fact are reviewed for clear error." *Id.* at 1303. Had we stopped there and both said nothing more about the standard of review and not applied the standard of review in a way that demonstrated what we meant by this division of the standard of review, perhaps the *Keohane* panel would have been free to construe those two propositions as it pleased, without running afoul of the prior-precedent rule.[4]

---

[4] That, too, is questionable (though less so than *Keohane*'s characterization of *Thomas*), in light of our prior description in *Brown*, 387 F.3d at 1351, that a plaintiff had to prove three "facts" to establish all three aspects of the subjective part of a deliberate-indifference claim.

32

But that was not the end of our discussion and application of the standard of review. Rather, later in *Thomas*, our statements concerning the appropriate standard of review, as well as our application of that standard of review, unmistakably show that the phrase "legal conclusion . . . that there was an Eighth Amendment violation" refers to "[t]he ultimate legal conclusion" of whether the defendants violated the Eighth Amendment, *Kosilek v. Spencer*, 774 F.3d 63 (1st Cir. 2014). And the phrase "[s]ubsidiary issues of fact" refers to the issues of fact that one of the objective-inquiry components and all the subjective-inquiry components of the deliberate-indifference analysis constitute.

Contrary to the Newsom Opinion's characterization of *Thomas*, there is nothing "conflicting" or "competing," *see* Newsom Op. at 11, 12, about *Thomas*'s direction. Nor does *Thomas* send "mixed messages." *Id.* at 12. *Thomas*'s precise statements applying clear-error review to all components of the subjective inquiry—outlined in detail below—are entirely harmonious with *Thomas*'s statement that de novo review applies to the overarching question of deliberate-indifference. The overarching standard of review is necessarily de novo because it incorporates within it de novo review of the objective inquiry of the deliberate-indifference analysis.[5]

---

[5] The Newsom Opinion attempts to alter the focus from my reason for seeking en banc review—*Keohane*'s failure to follow *Thomas* and abide by the prior-precedent rule—by arguing that daylight exists between Judge Wilson and me concerning *Thomas*'s holding on the applicable standard of review. *See* Newsom Op. at 13-15. It doesn't. I fully agree with Judge Wilson that *Thomas* applies the clear-error standard to all aspects of the subjective-inquiry prong of the deliberate-indifference test. *See Keohane*, 952 F.3d at 1287-90 (Wilson, J., dissenting). I likewise

33

And nothing in *Thomas* supports the *Keohane* majority opinion's suggestion that, by "[s]ubsidiary issues of fact," *Thomas* meant only what the *Keohane* majority opinion deemed "historical facts."  *See Keohane*, 952 F.3d at 1272 n.8.  Tellingly, the *Keohane* majority opinion cited nothing in *Thomas* for its contention.  Nor did *Thomas* ever use the term "historical facts."  On the contrary, as Judge Wilson's *Keohane* dissent and this dissent demonstrate in detail, *see infra* at 35-38, *Thomas* unambiguously applied the clearly erroneous standard of review to each of the three components of the subjective inquiry.  The *Keohane* majority opinion was not free to stray from the clear-error standard of review that *Thomas* held governs the components of the subjective inquiry.  Yet that is what it did.

---

understand *Thomas*'s statement that we review "the district court's . . . conclusion [] that there was an Eighth Amendment violation warranting equitable relief [] . . . de novo," *Thomas*, 614 F.3d at 1303, to refer in context to the notion that "[o]ur de novo review extends only to questions of law (i.e., the objectively-serious-need element) and to the district court's ultimate conclusion whether the objective and subjective elements of a deliberate indifference claim state an Eighth Amendment violation."  *Keohane*, 952 F.3d at 1287 (Wilson, J., dissenting).  As I have noted, it extends to the ultimate conclusion because the ultimate conclusion necessarily includes within it a determination based on de novo review (the objective inquiry).  And we're not the only ones to understand *Thomas*'s clear analysis this way.  Indeed, in *Kosilek v. Spencer*, 774 F.3d 63 (1st Cir. 2014), the First Circuit cited *Thomas* for the proposition that "[t]he ultimate legal conclusion of whether prison administrators have violated the Eighth Amendment is reviewed *de novo*," while quoting from *Thomas* in the supporting parenthetical only the following:  "Whether the record demonstrates that [the prisoner] was sprayed with chemical agents . . . and that he suffered psychological injuries from such sprayings are questions of fact.  Whether these deprivations are objectively 'sufficiently serious' to satisfy the ***objective*** prong, ***is a question of law*** . . . ."  *Kosilek*, 774 F.3d at 84 (quoting *Thomas*, 614 F.3d at 1307) (quotation marks omitted) (alterations by the *Kosilek* Court) (emphasis added).  Tellingly, *Kosilek* never refers to the subjective inquiry to provide an example of presenting any legal questions to show why *Thomas* refers to the overarching question of deliberate-indifference liability as subject to de novo review.  Nor does *Kosilek* cite *Thomas* for the proposition that any components of the subjective inquiry are subject to de novo review.

34

## C.

I begin with what *Thomas* had to say about how the standard of review applies to the evaluation of a district court's determination on the subjective inquiry of an Eighth Amendment deliberate-indifference claim—that is, whether the defendant (1) subjectively knew of a risk of serious harm; (2) nonetheless disregarded that risk; and (3) did so by conduct that is more than mere negligence. *Thomas*, 614 F.3d at 1312. *Thomas* explained that this inquiry requires us to determine whether "the evidence . . . demonstrate[s] that with knowledge of the infirm conditions, the official knowingly or recklessly declined to take actions that would have improved the conditions." *Id.* (internal quotation marks and alterations omitted). This summary of what the subjective inquiry requires encompassed all three prongs of the subjective inquiry: "knowledge of the infirm conditions" means the defendant "subjectively knew of a risk of serious harm"; "declined to take actions that would have improved the conditions" means the defendant "disregarded the risk"; and "knowingly or recklessly" did so means the defendant "did so by conduct that is more than mere negligence."

Immediately after we summarized what the three components of the subjective inquiry require, we unambiguously stated that "[a] prison official's deliberate indifference is a ***question of fact which we review for clear error***." *Id.* (emphasis added). Based on the placement and content of the remark, it is clear that

35

with this statement, we were referring to the entirety of the three-part subjective inquiry. Not only did this quotation appear immediately following our summary of all the elements of the subjective component of an Eighth Amendment violation, but significantly, by definition, "[a] prison official" can engage in "deliberate indifference" only if all three subjective-inquiry components are satisfied.

We need not review *Thomas* any further than this to know that we unambiguously held in *Thomas* that the district court's rulings on the entire subjective inquiry—including its rulings on all three of the subjective inquiry's components—are subject to the clearly erroneous standard of review.

But there's more. In addressing each of the three parts of the subjective inquiry in *Thomas*, we again said and demonstrated that each component is to be reviewed for clear error.

With respect to the first question—whether the defendant subjectively knew of a risk of serious harm—we relied in *Thomas* on *Farmer v. Brennan*, 511 U.S. 825, 842 (1994), citing to *Farmer*'s proposition that "[w]hether a prison official had the requisite knowledge of a substantial risk is a ***question of fact*** subject to demonstration in the usual ways . . . ."[6]  *See Thomas*, 614 F.3d at 1313 (quoting *Farmer*, 511 U.S. at 842) (alteration omitted) (emphasis added).

---

[6] Though in *Thomas* we omitted the phrase "question of fact" from the *Farmer* quotation, we did so only to avoid repetition of the phrase "question of fact," which appears in the sentence immediately preceding the *Farmer* quotation. As I've noted above, that sentence states that the

As to the second and third parts of the test—whether the defendant disregarded this risk by more than mere negligence—we concluded that "[t]he record . . . *supports the district court's finding* that the Secretary of the [FDC] and the Warden . . . recklessly disregarded the risk of psychological harm to inmates like [the *Thomas* plaintiff]." *Id.* at 1315 (emphasis added). We then described the evidence in the record that underpinned the district court's finding. *Id.* For example, we opined that "the [FDC]'s refusal to modify its non-spontaneous use-of-force policy provides *support for the district court's finding* of more than mere or even gross negligence on the part of the [FDC]." *Id.* (emphasis added). The repeated references to evidence in the record and uses of the words "support for the district court's finding" further unmistakably demonstrate that we viewed the district court's "findings" as factual findings, and we reviewed them for clear error.

But you need not take my word for it. *Thomas* says as much. Thomas began its analysis by invoking the clear error-test and by summarizing its conclusion that the defendant failed to meet that standard: "[O]ur review of the district court's voluminous uncontested *factual findings* as they relate to the defendants' deliberate indifference *does not leave us with the definite and firm conviction that a mistake has been committed*. Accordingly, the defendants have failed to satisfy their burden

---

entire subjective inquiry is a question of fact we review for clear error. *See Thomas*, 614 F.3d at 1312.

of ***demonstrating the district court's clear error***."   *Thomas*, 614 F.3d at 1313 (emphasis added).

That was no mistake.  *Thomas*  also ended its discussion of the second and third components of the subjective inquiry by summing up that it could not "conclude that the district court was ***clearly erroneous*** in ***finding*** that the record demonstrates that FDC officials turned a blind eye to [the plaintiff's] mental health needs and the obvious danger that the use of chemical agents presented to his psychological well-being."   *Id.* at 1316 (internal quotation marks omitted and emphasis added).  In our very next sentence, we explained that "[t]urning a blind eye to such obvious danger provides ample ***support for the [district court's] finding*** of the requisite recklessness."   *Id.*   (emphasis added).   Finally, we held that "an examination of [the] entire record demonstrates that the district court did not commit ***clear error*** in ***finding*** the defendants' deliberate indifference."  *Id.* at 1317 (emphasis added).

In short, our discussion in *Thomas* of the subjective inquiry of the deliberate-indifference claim repeatedly shows that we characterized and treated each of the three components as factual ones, governed by the clearly erroneous standard of review on appeal.

Whether each of us personally agrees or disagrees that a clear-error standard of review is a good idea for each of the components of the subjective inquiry, *see*

Newsom Op. at 16 n.3, is irrelevant.  It is beyond dispute that *Thomas* held that clear-error review governs.

In contrast, the *Keohane* majority opinion reviewed de novo the district court's findings on the second and third parts of the subjective inquiry.[7]  *See Keohane*, 952 F.3d at 1274-78.  In fact, except in a footnote dismissing the notion that clear-error review applies to each of the three components of the district court's factual findings on the subjective inquiry, the majority opinion never once employed the term "clear error" in conducting its analysis.  *See id.*  And even in that footnote, the *Keohane* panel opined only that even assuming the clear-error standard of review governs review of the district court's findings on each of the three subparts of the subjective inquiry, "we would have little trouble formulating the required firm conviction that a mistake had been committed."  *Id.* at 1272 n.8 (citation and internal quotation marks omitted).  The majority opinion said so, though, without any corresponding analysis other than a throwaway reference to its legal-error analysis in the text.  *See id.*

Perhaps most disturbingly, though, despite the *Keohane* majority opinion's use of the de novo standard of review to review the second and third subparts of the

---

[7] The *Keohane* majority opinion concluded that it did not need to evaluate whether the district court correctly determined that the prison officials had actual knowledge of a risk of serious harm because, in any case, Keohane did not establish the second and third parts of the subjective inquiry.  952 F.3d at 1274.  For that reason, the *Keohane* majority opinion did not expressly review the first part of the district court's ruling on the subjective inquiry.

district court's subjective inquiry on Keohane's deliberate-indifference claim, the *Keohane* majority opinion asserted that it followed *Thomas*.  But in support of this proposition, the *Keohane* majority opinion relied solely on *Thomas*'s statements that we review de novo whether "there was an Eighth Amendment violation" and that "[s]ubsidiary issues of fact are reviewed for clear error."  *See Keohane*, 952 F.3d at 1265 n.2.  Likewise, that is the sole "breadcrumb[]" from *Thomas* that the Newsom Opinion cites in justifying *Keohane*'s application of de novo review to all components of the subjective inquiry.  *See* Newsom Op. at 11-12.

But as I have already discussed, that one "breadcrumb[]" is part of a trail that leads inescapably to the conclusion that *Thomas* holds that the clear-error standard governs the subjective inquiry.

Yet that one statement deprived of its proper context is the only thing that *Keohane* and the Newsom Opinion point to from *Thomas* to justify *Keohane*'s conclusion that *Thomas* required de novo review of the subjective inquiry.  Indeed, neither *Keohane* nor the Newsom Opinion responds to *any* of the numerous quotations Judge Wilson's dissent and I have cited from *Thomas* that show that *Thomas* held that clear-error review governs the subjective inquiry.  *Keohane* and the Newsom Opinion just ignore them.  But ignoring *Thomas*'s words does not make *Thomas*'s holding go away.

40

Rather than explaining how *Keohane*'s holding can possibly be consistent with *Thomas*'s numerous quotations, the Newsom Opinion takes a different tack: it appears to attempt to distract the reader from its inability to demonstrate that *Keohane* does not violate *Thomas*. Indeed, careful readers can't help but notice that the Newsom Opinion spends nearly all its pages trying to change the subject.

For example, it defends at length the correctness of the outcome of *Keohane* and the new rule that the *Keohane* panel imposed contrary to *Thomas*'s rule. *See*, *e.g.*, Newsom Op. at 8-9 (arguing the facts of Keohane's case—including defending the FDC's decision not to allow Keohane to dress and groom herself as a woman— that have no bearing on whether *Keohane* followed *Thomas*), 16 (opining that, as a matter of law, it makes better sense for appellate courts to "decide[] what the Eighth Amendment ultimately means and requires in a given case" because anything else would be "an odd state of affairs."[8]), 16-19 (contending that *United States v. Bajakajian*, 524 U.S. 321 (1998), *Ornelas v. United States*, 517 U.S. 690 (1996), *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424 (2001)—none of which *Thomas* cites, by the way—support the new *Keohane* rule), 19-21 (discussing *Kosilek v. Spencer*, 774 F.3d 63 (1st Cir. 2014), to support the notion

---

[8] Most respectfully, I disagree that district courts are somehow not equipped to make capable rulings on the application of the subjective-inquiry components of the Eighth Amendment deliberate-indifference standard in any given case. And even if a district court erred, it would not be the last word on the matter, since a party could always appeal to the circuit court. Clearly erroneous review does not mean no review.

41

that de novo review is the correct legal answer to the standard of review that should govern the components of the subjective inquiry[9]).

The Newsom Opinion also tries to divert attention from its failure to show how it is consistent with *Thomas* by grading my writing and that of the *Thomas* panel. *See*, *e.g.*, Newsom Op. at 3, 4, 12, 21, 22.

These distraction tactics miss the point. Whether de novo review of the components of the subjective inquiry is or is not a better answer than *Thomas*'s clear-error review is not the issue here. And whether I use too many adverbs in my writing or whether the Newsom Opinion likes how *Thomas* is written is similarly irrelevant to the issue before the Court.

The only question here is whether *Keohane* is faithful to *Thomas*. The Newsom Opinion's failure to show how the numerous quoted statements from *Thomas* can possibly be consistent with *Keohane*'s new rule applying the de novo standard of review to the subjective inquiry answers that question with a resounding "no."[10]

---

[9] *Kosilek*'s sole citation of *Thomas* for the proposition that "[t]he ultimate legal conclusion of whether prison administrators have violated the Eighth Amendment is reviewed *de novo*." *Kosilek*, 774 F.3d at 84, also does not show that *Thomas* applied de novo review to the components of the *subjective* inquiry. In fact, as I have explained in note 5, *supra*, it demonstrates the opposite. So to be clear, *Kosilek* did not purport to read *Thomas* to hold that the components of the subjective inquiry are subject to de novo review.

[10] The W. Pryor Opinion's silence on this issue likewise speaks volumes: the W. Pryor Opinion doesn't even try to show that *Keohane* is consistent with *Thomas* or that it didn't violate the prior-precedent rule. Nor does it defend *Keohane*'s interpretation of the prior-precedent rule, which allows a later panel to reinvent the holding of a prior panel.

The *Keohane* majority opinion reached another conclusion only because it viewed *Thomas*'s plain language to require a "mindless, mechanical box-checking assessment." *Id.* So the *Keohane* majority opinion reasoned that what *Thomas* unambiguously said "cannot possibly be what we've meant[.]" *Id.* That language from *Keohane*, in and of itself, gives up the game and implicitly concedes that the *Keohane* majority opinion did not follow *Thomas*.

## III.

Under our prior-precedent rule, it was not up to the *Keohane* panel to reimagine the meaning of *Thomas*'s unmistakable language holding that the clearly erroneous standard of review applies to the second and third components of the subjective inquiry. The *Keohane* panel was bound by *Thomas*, whether it agreed with it or not and whether it found *Thomas*'s standard of review to be consistent with "meaningful appellate review" or not. *Id.* If the *Keohane* panel had a problem with the standard of review that *Thomas* requires, as Judge Wilson pointed out in his *Keohane* dissent, 952 F.3d at 1292 (Wilson, J., dissenting), its only option under the prior-precedent rule was to apply the *Thomas* standards and call for en banc review. There was no option to recast *Thomas* as having held that de novo review applies when *Thomas* in fact and unmistakably held that clearly erroneous review governs.

Because the *Keohane* panel's holding on the applicable standards of review conflicts directly with the *Thomas* panel's, the *Keohane* panel introduced conflict in

43

our precedent. Under our earliest-precedent rule, "[w]hen we have conflicting [precedents], we follow our oldest precedent." *CSX Transp., Inc. v. Gen. Mills, Inc.*, 846 F.3d 1333, 1338 (11th Cir. 2017) (citation and internal quotation marks omitted). So the earliest-precedent rule requires later panels and district courts to follow *Thomas*. But because *Keohane* claims to be consistent with *Thomas*, *Keohane* purports to render the earliest-precedent rule inapplicable. To do that, though, it violates the prior-precedent rule by failing to abide by *Thomas*'s true holding imposing the clearly erroneous standard of review and by instead pretending that *Thomas* sanctioned the de novo standard of review when it demonstrably did not.

Ultimately, our refusal to hear *Keohane* en banc creates a mess with respect to the current state of the law concerning the correct standards of review governing the components of the subjective inquiry on an Eighth Amendment deliberate-indifference claim: should district courts and later panels follow *Thomas*, as our prior-precedent rule requires, or should they follow *Keohane*, which holds the opposite of *Thomas* while claiming to have followed it?

But the real problem is that our refusal to hear *Keohane* en banc sows uncertainty as to the meaning and strength of our prior-precedent rule. This may be no big deal to the W. Pryor Opinion (though that opinion never tells us why). But as I have noted, *see supra* at Section I, for good reason, we as a Court have

44

historically viewed anything that erodes the prior-precedent rule as a critical threat to the stability and predictability of the law. *See Smith*, 236 F.3d at 1303; *see also Steele*, 147 F.3d at 1317-18. *Keohane*'s rogue interpretation of the prior-precedent rule certainly qualifies as such a threat.

If we are willing to accept *Keohane* as compliant with our prior-precedent rule, then our prior precedent means only what the last panel to have reconstrued what the deciding panel held says it means—no matter how inconsistent the most recent panel's interpretation may be with what the deciding panel actually held. As a result, the practical effect is that no later panel will be bound by anything an earlier panel said.

For these reasons, regardless of what any individual judge on this Court believes the correct standard of review here to be, a bigger issue is at stake: the rule of law imposes an obligation to rehear *Keohane* en banc and reaffirm our "emphatic[ally]" strict adherence to the prior-precedent rule. *See Steele*, 147 F.3d at 1318 (citation omitted). Then, if a majority of judges on the Court thinks *Thomas* got it wrong, the Court can say so and change our precedent. But a panel cannot and should not be allowed to do that. And a panel certainly should not be permitted to do so by reinterpreting our prior-precedent rule to the point where it allows precisely what it has always prohibited: a later panel to issue a holding that directly conflicts with an earlier panel's precedent.

45

By any recognized measure, *Keohane* demands en banc review.  We must do better in the future.